**LYNCH CARPENTER LLP**
Todd D. Carpenter (CA 234464)
todd@lcllp.com
Scott G. Braden (CA 305051)
scott@lcllp.com
James B. Drimmer (CA 196890)
jim@lcllp.com
1234 Camino Del Mar
Del Mar, California 92014
Telephone:   (619) 762-1900
Facsimile:   (858) 313-1850

*Attorneys for Plaintiffs and
Proposed Class Counsel*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK WILLIAMS and PAMELA CHO on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UNDER ARMOUR, INC., a Maryland corporation, and DOES 1-50, inclusive, <br><br> Defendants. | Case No.: <br><br> **CLASS ACTION COMPLAINT** <br><br> **Violations of:** <br><br> 1. **California's Unfair Competition Laws ("UCL"), CAL. BUS. & PROF. CODE §§ 17200,** *et seq.*; <br><br> 2. **California's False Advertising Laws ("FAL"), CAL. BUS. & PROF. CODE §§ 17500,** *et seq.*; <br><br> 3. **California Consumer Legal Remedies Act ("CLRA"), CAL. BUS. & PROF. CODE §§ 17200,** *et seq.*; <br><br> **[DEMAND FOR JURY TRIAL]** |

Plaintiffs Mark Williams and Pamela Cho (collectively, "Plaintiffs") bring this action, on behalf of themselves and all others similarly situated, against Defendant Under Armour, Inc. ("Under Armour" or "Defendant") and state:

## IV.   NATURE OF ACTION

1.      "Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society." *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971). This principle is as true today as it was over 50 years ago when it was penned by Justice Mosk writing for a unanimous California Supreme Court. This putative class action is about holding a multimillion-dollar company accountable to its customers who have been deceived by a years-long campaign to trick them into paying more for Under Armour's fashion merchandise through the widespread and perpetual use of false reference and discount pricing. "In short, the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin et al., *Competition and the Regulation of Fictitious Pricing*, 87 J. Mktg., 826, 835 (2023).

2.      Prices reflect a perceived value to consumers.[1] False advertising of prices can be used to manipulate consumers' value perception of products and cause consumers to overpay for them. Aware of the intertwined connection between consumers' buying decision processes and price, retailers like Defendant lure consumers with advertised discounts that promise huge savings and high value. But the promised savings are false, and the product's value reflected in its price is

---

[1] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (1992) [hereinafter Grewal & Compeau, *Comparative Price Advertising*] ("[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price."); Patrick J. Kaufmann et al., *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. RETAILING 115, 118 (1994) ("[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value").

CLASS ACTION COMPLAINT

incorrect when the retailer advertises discounts off of some higher, made-up, and artificially inflated "original" price that no one ever pays.

3.   At all relevant times, Defendant has continually advertised false price discounts for merchandise sold throughout its Under Armour Factory outlet stores. In bringing this putative class action complaint, Plaintiffs seek to remedy this deception and its attendant harm to consumers. Plaintiffs seek monetary damages, restitution, and declaratory and injunctive relief from Defendant arising from their false discounting scheme on apparel, accessories, shoes, and other items sold in its Under Armour Factory outlet stores and the outlet portion of its e-commerce website, underarmour.com/en-us/c/outlet/.

4.   False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice artificially inflates the market price for these products by raising consumers' internal reference price and in turn the perceived value consumers ascribe to these products (i.e., demand).[2] Consequently, false reference pricing schemes enable retailers, like Defendant, to sell products above their true market price and value, leaving consumers to pay the inflated price regardless of what they thought of the purported discount. Consumers are thus damaged not only by not receiving the promised discount, but by paying a premium the products would not have commanded but for the false reference pricing scheme.

5.   The following example of a hypothetical DVD seller, which parallels Defendant's practice, illustrates how false reference pricing schemes harm consumers: the seller knows it can sell a particular DVD at $5.00, which represents both the market price and the price at which the seller could regularly make a profit.

---

[2] Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 55 ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

Instead, however, the seller creates a fake "original" price for the DVD of $100.00 and advertises the DVD as "on sale" at 90% off, creating a (fake) "sale" price of $10.00. Consumers purchase the DVD for $10.00 believing they got a "good deal" since it was previously sold—i.e., valued by others in the market—at an "original" price of $100.00, and presumably would be again soon.

6.     The consumer's presumption and purchase stem directly from the seller's deception. If the seller did not employ a false referencing pricing scheme, it would not be able to sell many, if any, DVDs at $10.00 because the true market value of the DVD is $5.00. However, the false reference pricing scheme enables the seller to fabricate an increase in consumer demand for the DVD through the reasonable, but incorrect, ***perceived value*** of the DVD ($100.00) in connection with the substantial discount of $90.00. The net effect of myriad consumers' increased willingness to pay $10.00 for the DVD. Thus  the seller artificially inflates the market price for the DVD to $10.00 by advertising the false "original" price and corresponding fake discount.

7.     Through its false and misleading marketing, advertising, and pricing scheme alleged herein, Defendant violated, and continues to violate, California and federal law. Specifically, Defendant violated and continues to violate: California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* (the "UCL"); California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* (the "FAL"); California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq* (the "CLRA").; and the Federal Trade Commission ("FTC") Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

8.     Plaintiffs bring this action on behalf of themselves and other similarly situated consumers who have purchased one or more of Defendant's Factory outlet items advertised a purported discount from a fictitious higher reference price from Under Armour Factory outlet stores and underarmour.com/en-us/c/outlet/. Plaintiffs

intend to halt the dissemination and perpetuation of this false, misleading, and deceptive pricing scheme, to correct the false and harmful perception it has created in the minds of consumers, and to obtain redress for those who overpaid for merchandise tainted by this deceptive pricing scheme. Plaintiffs also seek to permanently enjoin Defendant from engaging in this unlawful conduct. Further, Plaintiffs seek to obtain all applicable damages, including actual, compensatory, benefit of the bargain, statutory, and punitive; equitable restitution; reasonable costs and attorneys' fees; and other appropriate relief in the amount by which Defendant was unjustly enriched as a result of its sales of merchandise offered a false discount.

## V.    JURISDICTION AND VENUE

9.    This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and Plaintiffs, and at least some members of the proposed Class (defined below), have a different state citizenship from Defendant.

10.    The Central District of California has personal jurisdiction over Defendant because Defendant is a corporation or other business entity which does conduct business in the State of California. Defendant conducts sufficient business with sufficient minimum contacts in California, and/or otherwise intentionally avails itself to the California market through the operation of the Outlets within the State of California.

11.    Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendant transacts substantial business in this District. A substantial part of the events giving rise to Plaintiffs' claims arose here.

## VI.    GENERAL ALLEGATIONS

### A.    Retailers Benefit from False Reference Pricing Schemes.

12.    Defendant engages in a false and misleading reference price scheme in the marketing and selling of its Under Armour Factory outlet merchandise at its

Under Armour Factory outlet stores and e-commerce website, underarmour.com/en-us/c/outlet/.

13.    Retailers like Defendant can and do benefit substantially from false discounting schemes because "framing a price increase as a discount can not only allow the firm to get **higher margins**, but also **increase sales**." Staelin et al., *supra*, at 835 (emphasis added). This is because consumers use advertised reference prices to make purchase decisions, particularly when the information available to consumers can vary among different types of products.[3] Most often, as with retail clothing, consumers lack full information about the products and, as a result, often use information from sellers to make purchase decisions.[4]

14.    Defendant's deceptive advertised reference prices are thus incorporated into consumers' decision process. First, a product's "price is also used as an indicator of product quality."[5] In other words, consumers view Defendant's deceptive advertised reference prices as a proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[6] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more

---

[3] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (e.g., style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (e.g., longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (e.g., whether the shirt's cotton was produced using organic farming methods). Michael R. Darby & Edi Karni. *Free Competition and the Optimal Amount of Fraud*, 16 no. 1 J. LAW & ECON. 67, 68-69 (1973).

[4] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Phillip Nelson. *Information and Consumer Behavior*. 78, no. 2 J. POL. ECON. 311, 311-12 (1970).

[5] Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 54; *see also* Richard Thaler. *Mental Accounting and Consumer Choice*, 4, no. 3 MKTG. SCI. 199, 212 (1985) [hereinafter Thaler, *Mental Accounting and Consumer Choice*] ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[6] Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 52.

satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[7] Under this concept, coined as "transaction utility" by Nobel Prize-winning economist Richard Thaler, consumers place value on the psychological experience of obtaining a product at a perceived bargain.[8]

15. Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[9] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (e.g., a "suggested retail price," or other comparative sale price).[10] Researchers report that consumers' internal reference prices adjust toward external reference prices when valuing a product.[11] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[12] In other words, "[t]he deceptive potential of such advertised reference

---

[7] Peter Darke & Darren Dahl. *Fairness and Discounts: The Subjective Value of a Bargain*, 13 no 3 J. OF CONSUMER PSYCH. 328 (2003).

[8] "To incorporate . . . the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal.'" Richard Thaler. *Mental Accounting*, *supra* n.6, at 205.

[9] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Glenn E. Mayhew & Russell S. Winer. *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*, 19 no. 1 J. OF CONSUMER RSCH. 62, 68 (1992) [hereinafter Mayhew & Winer, *An Empirical Analysis*].

[10] Mayhew & Winer, *An Empirical Analysis*, *supra* n.10, at 62.

[11] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Dhruv Grewal et al., *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions.* 62 J. OF MKTG. 46, 48 (1998) [hereinafter Grewal et al., *The Effects of Price-Comparison Advertising*].

[12] As Thaler notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Richard Thaler. *Mental Accounting*, *supra* n.6, at 212.

prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[13] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[14] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][15]

16.    In Staelin, *Regulation of Fictitious Pricing*, published just last year, authors Richard Staelin, a Duke marketing professor since 1982, Joel Urbany, a Notre Dame marketing professor since 1999, and Donald Ngwe, a senior principal economist for Microsoft and former marketing professor for Harvard, built on their prior analytic work to explain the effects of false reference pricing schemes and why their use has not dissipated as previously expected by the FTC, but rather have become more prevalent in the absence of FTC regulation. Importantly, this new study cites and confirms many of the same older consumer studies cited above[16] and

---

[13] Dhruv Grewal & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*, 18 no.1 J. PUB. POL'Y & MKTG. 3, 7 (1999) [hereinafter Grewal & Compeau, *Pricing and public policy*].

[14] Gurumurthy Kalvanaram & Russell S. Winer. *Empirical Generalizations from Reference Price Research*. 14, no. 3 MKTG. SCI. G161 (1995); *see also* Jerry B. Gotlieb & Cyndy Thomas Fitzgerald. *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*. 6 no. 1 J. OF APPLIED BUS. RSCH. 59, 65-66 (1990) [hereinafter Gotlieb & Fitzgerald, *An Investigation*] ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

[15] Grewal & Compeau, *Pricing and public policy*, *supra* n.14, at 7.

[16] *See* Staelin et al., *supra*, at 826 ("It is now well accepted that many consumers get extra utility, beyond that associated with consuming a product from purchasing it on deal [] and that magnitude of this utility is a function of the size of the deal.") (emphasis added).

notes that the findings of these "older" studies are still widely accepted relevant principles in the economic discipline. *See id.*

17.    Additionally, Staelin, *Regulation of Fictitious Pricing*, explains how the modern development of consumer search behavior and options available to consumers (e.g., smartphones, online shopping) has actually *spread* the presence of fictitious reference pricing, not extinguished it.[17] According to Staelin and his co-authors, "disclosure of the true normal price charged may be the only solution that could plausibly influence both consumer and firm behavior." *Id.* at 826. *See also id.* at 831 ("Identical firms, selling identical products, make positive profits because of their obfuscation strategy, and the likelihood of obfuscation grows as competition intensifies.").

18.    Consequently, retailers like Defendant, who understand that consumers are susceptible to a bargain, have a substantial financial interest in making consumers think they *are* getting a bargain, even when they are not. Contrary to the illusory bargains in Defendant's advertisements, consumers are not receiving *any* discount and are actually *overpaying* for Defendant's product because, as Staelin *et al.* put it, "[t]he magnitude of both real and fake discount[s] were significant predictors of demand above the effects of the actual sales price, **with fake discounts having a substantially larger effect than real discounts**.") *Id.* at 835 (emphasis added).

**B.    Defendant Engages in a Fraudulent Price Discounting Scheme.**

19.    Defendant is a specialty retailer of athletic apparel. For years, Defendant has engaged in a fake discounting scheme that harms consumers by advertising its outlet merchandise at discounted "sale" prices in its outlet stores and on the outlet portion of its e-commerce website, underarmour.com/en-us/c/outlet/. In short, Defendant markets its outlet merchandise with the "sale" prices as discounts from its "original" prices listed on the products' price tags in both its outlet brick-

---

[17] Staelin et al., *supra*, at 826. (explaining how the study "develop(s) a descriptive model explaining why fictitious reference pricing has spread instead of being extinguished by competition.").

and-mortar and e-commerce stores. In most in-store cases, the items are each accompanied by a placard sign immediately above them[18] advertising a "__% Off" In other instances, the sale placards advertise a whole-price discount that is usually substantially less than the "original" price. The discount placard signs are printed on black and red card stock with bold, white lettering advertising the fake discount. Defendant does *not* advertise or otherwise disclose the date on which any item was last offered for its "original" price.

20.     The photos below demonstrate Defendant's uniform storewide practice in place at all Under Armour Factory stores.[19]

 

<hr>

[18] In other cases, such as with table displays, the discount sign applies to several, typically similar, items.

[19] *See* **Exhibit A**, additional Under Armour Factory in-store photographs depicting the extent and pervasiveness of Defendant's discounting scheme.



21.     As shown in the above photos Defendant's "original" (or "MSRP") prices are unaccompanied by any qualifying language directing consumers to compare Defendant's reference prices and purported discounts to any other outside market (such as the oft-used "compare at" or "comparable value" reference price qualifiers).[20] And with good reason: all, or virtually all, of the merchandise sold at Under Armour Factory outlet stores is manufactured for and sold exclusively at Under Armour Factory stores. *See* Under Armour, Inc., Annual Report (Form 10-

---

[20] In those schemes an advertiser compares its prices to those of competitors using words such as "compare at" or "comparable value" on its price tags to qualify its reference prices. Accordingly, Plaintiffs are *not* required to "'assert evidence from which a rational trier of fact could infer that the **comparative** reference price was inaccurate[,]'" *Harris v. PFI W. Stores Inc.*, No. SACV192521JVSADSX, 2020 WL 3965022, at *4 (C.D. Cal. Apr. 9, 2020) (citing *Sperling*, 291 F. Supp. 3d at 1085-86) (emphasis added), because, "th[at] situation **only arises when the language of the advertisement implies a comparison to another retailer**. *Id.* (citing *Horosny v. Burlington Coat Factory of California, LLC*, No. CV1505005SJOMRWX, 2015 WL 12532178, at *6 (C.D. Cal. Oct. 26, 2015) (emphasis added).

K), at p. 4 (May 24, 2023) ("2023 10-K") ("Factory House store products are specifically designed for sale in our Factory House stores").[21]

22. The reasonable impression that Defendant's reference prices denote limited-time discounts from *former* prices are reinforced by Defendant's pervasive use of "__% OFF" advertisements, as well as Defendant's explicit reference to the price tag prices as the "original price" on consumers' receipts, along with the purported percent-off discount and "you saved" amount. *See* **Exhibit B**.[22] Additionally, as discussed below, Defendant's reference pricing scheme on its Factory outlet website employs unqualified reference prices, likewise indicating a reduction from a former price. Thus, Defendant does not advertise any "discounts" from any other stores, including its own mainline Under Armour stores.

23. The "MSRP" qualifier accompanying Defendant's in-store reference prices on its *exclusive* (and any fractional non-exclusive) Factory store items, is not a comparison to another market, such as with "compare at" qualifiers. To the extent Defendant's Factory store advertised discounts can be characterized as "suggested retail prices," or "MSRPs," Defendant's advertised reference price and discounting scheme also violates 16 C.F.R. § 233.3, which pertains to "advertis[ements] [of] retail prices which have been established or suggested by manufacturers." This is

---

[21] *See Sperling v. Stein Mart, Inc.*, 291 F. Supp. 3d 1076, 1084 (C.D. Cal. 2018) ("In exclusive product cases, a store, often an outlet store, sells a lower-price, different version of a product sold in a traditional retail store. The outlet uses the price of the product made for the retail store as a comparative reference price on price tags. However, the actual product being sold in the outlet is made exclusively for the outlet and is never sold for the comparative reference price at a traditional retail store. In those cases, courts generally find that a plaintiff can proceed with his or her claims."); *see, e.g., Rubenstein v. Neiman Marcus Grp. LLC*, 687 F.App'x 564, 567 (9th Cir. 2017); *Stathakos v. Columbia Sportswear Co.*, No. 15-cv-04543-YGR, 2017 WL 1957063, at *8 (N.D. Cal. May 11, 2017); *Branca v. Nordstrom, Inc.*, No. 14cv2062-MMA, 2015 WL 10436858, at *7–8 (S.D. Cal. Oct. 9, 2015).

[22] *See Vizcarra v. Michaels Stores, Inc.*, No. 23-cv-00468-PCP, __ F. Supp. 3d __, 2024 WL 64747, at *4 (N.D. Cal. Jan. 5, 2024) ("A reasonable consumer does not need language such as, 'Formerly $9.99, Now 40% Off $9.99,' or '40% Off the Former Price of $9.99,' to reasonably understand '40% off' to mean 40% off the former price of the product.") (quoting *Knapp v. Art.com, Inc.*, No. 16-CV-00768-WHO, 2016 WL 3268995, at *4 (N.D. Cal. June 15, 2016)).

because 16 C.F.R. § 233.3(a) provides that "[t]o the extent that list or suggested retail prices do not in fact correspond to prices at which a substantial number of sales of *the article in question* are made, the advertisement of a reduction may mislead the consumer." (emphasis added). Here, the items sold in Defendant's Under Armour Factory outlet stores are *never* sold there, or anywhere, at the "list or suggested retail prices"—and certainly not at a "substantial number of sales." Moreover, as the manufacturer and exclusive retailer of most, if not all, of the Factory outlet merchandise, Defendant knows, or certainly should know, that substantial sales at these reference prices are not occurring. *See* 16 C.F.R. § 233.3(d) ("[I]f the list price is significantly in excess of the highest price at which substantial sales in the trade area are made, there is a clear and serious danger of the consumer being misled by an advertised reduction from this price."). At the very least, the resolution of these issues raises a reasonable question of fact.

24. With respect to Defendant's Factory outlet sales at underarmour.com/en-us/c/outlet/, Defendant engages in the online equivalent of its brick-and-mortar practice, if not a more egregious practice. That is, Defendant perpetually advertises Under Armour Factory merchandise with an "original" price (in grey or red font) with a strikethrough on it (i.e., crossed out: e.g., ~~$35.00~~) next to a corresponding "Sale" price (e.g., "$17.50"), which represents a whole-price "discount" from the struck-through (fictitious) "original" price. The "sales" price appears in slightly darker black font. Like Defendant's in-store Under Armour Factory products, the false reference prices advertised at underarmour.com/en-us/c/outlet/ operate as a baseline for consumers to rely on to assess a product's value. Defendant's strikethrough reference price/sales price scheme here reasonably communicates to consumers that the product is being offered at a substantial discount from a former price for a limited time and will return to that price if the

shopper fails to act. The photos below illustrate this practice, which is uniform across the e-commerce website, and is employed on both list and product pages.[23]



[23] Attached hereto as **Exhibit C** are numerous snapshots from Underarmour.com/en-us/c/outlet/ showing an assortment of merchandise items advertised with false discounts. Attached as **Exhibit D** are numerous snapshots of the website acquired from the Wayback Machine. Wayback Machine (accessible at https://wayback-api.archive.org/) is a well-regarded internet archive of websites and webpages as they existed at one point in time. In other words, while a website may update its content periodically, WBM permits users to view it exactly as it appears on the date the page snapshot is taken. The date of the snapshot is shown at the top of each page. **Exhibit D** therefore offers further evidence of the perpetual nature of Defendant's false discounting scheme employed at its e-commerce store at Underarmour.com/en-us/c/outlet/.

25.     Additionally, the Under Armour Factory products sold in-store and at underarmour.com/en-us/c/outlet/ are the same. There is also no meaningful difference from Defendant's Under Armour Factory inventory—the same products are sold at every store and online and the same fraudulent pricing scheme is deployed uniformly across both sales channels. The only difference is the in-store reference prices are accompanied by the misleading MSRP qualifier while the online items are not. Both channels consist virtually entirely of exclusive, made-for-outlet products not sold in Under Armour mainline stores or department stores.

26.     And even if Defendant did offer the Factory outlet products at their full reference price (it does not), that offering would not legitimize Defendant's practice. This is because, for the advertised former price to be "actual, bona fide" and "legitimate" it must be the "price at which the article was offered to the public *on a regular basis for a reasonably substantial period of time*." 16 C.F.R. § 233.1(a) (emphasis added). Nor would such rare offerings constitute the "prevailing market price" within the "three months next immediately preceding the publication of the advertisement," as is required by the FAL, Cal. Bus. & Prof. Code § 17501, "unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement[,]" which Defendant also fails to do on *all* advertisements. Rather, the advertised reference prices on Under Armour Factory merchandise are *not* the price at which Defendant regularly (or ever) sells, or expects to regularly sell, the merchandise; they are merely a basis for misleading consumers into believing they are receiving a substantial discount.

27.     In sum, Defendant's fake discount scheme is intended to (and does) increase Defendant's sales while depriving consumers of the benefit of their bargain and causing them to spend more money than the Factory outlet store items are actually worth—the price they could command in the absence of the fake discount. The Under Armour Factory products sold in both the brick-and-mortar Under Armour Factory stores and underarmour.com/en-us/c/outlet/ are never—or virtually

never—offered for sale or actually sold at their "original" or "price tag" prices. The reference prices and accompanying "discounts" are therefore fraudulent and used solely to induce consumers to make purchases and spend more under the reasonable, but incorrect, belief that the merchandise was once sold at its advertised reference price in either (1) the brick-and-mortar Under Armour store, (2) underarmour.com/en-us/c/outlet/, or (2) the Under Armour mainline store (which sells higher quality Under Armour-branded merchandise) at a significant discount when, in fact, they are purchasing inferior quality, ***made-for-factory-outlet***, merchandise that has never been offered outside of an Under Armour Factory store and, even there, never (or virtually never) at the higher "original" price advertised on its price tag. Such misconduct deprives consumers of a fair opportunity to fully evaluate the offers and to make purchase decisions based on accurate information and results in the illegal imposition of a price premium the Factory store merchandise could not and would not otherwise command, which consumers, like Plaintiffs, are duped into paying.

**C.    Defendant's Fraudulent Price Discounting Scheme Harms All Consumers.**

28.    A product's reference price matters because it serves as a baseline upon which consumers perceive its value.[24] Empirical studies "suggest that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[25] Consumers are misled and incorrectly overvalue Defendant's Factory products as a result of the false price comparisons. The products' actual sales prices, therefore, reflect consumers' overvaluation of them, which in turn permits Defendant to command inflated prices

---

[24]  Thaler, *Mental Accounting and Consumer Choice*, *supra* n.6, at 212.

[25]  Gotlieb & Fitzgerald, *An Investigation*, *supra* n.15, at 66. Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id*. at 60.

for them beyond what the market would otherwise allow. As discussed above, academic researchers have documented the relationship between reference prices and consumer behavior, as well as the resulting harm from false reference prices:

> [A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal reference prices, when compared with the lower selling price, result in higher transaction value perceptions. The increase in perceived transaction value enhances purchases and reduces search behavior for lower prices. If sellers intentionally increase the advertised reference prices above normal retail prices, this is, inflate advertised reference prices, the resulting inflated perceptions of transaction value would be deceptive. Harm to both buyers and competitors could result from the effect of the inflated transaction value on buyers' search and purchase behaviors.[26]

29.     Accordingly, all consumers who purchase Under Armour Factory merchandise are harmed by Defendant's pricing scheme because its impact pervades the entire market for Under Armour Factory merchandise. This is because, again, the artificially increased demand generated by Defendant's pricing scheme results in increased actual sales prices beyond what the products would command in the absence of the false reference pricing scheme. Again, "the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin *et al.*, *supra*, at 835. Thus, all Under Armour Factory shoppers pay more regardless of their individual beliefs or purchasing decision processes. In other words, their subjective beliefs about the value of the products or the legitimacy of the purported discounts are inconsequential to the injury they incur when purchasing Defendant's Under Armour Factory merchandise. All consumers who purchase falsely discounted Under Armour Factory outlet products have overpaid are deprived of the benefit of the bargain (i.e.,

---

[26]Dhruv Grewal et al., *The Effects of Price-Comparison Advertising*, *supra* n.12, at 46.

the promised discount). Additionally, they will have paid a premium for merchandise that is worth less than its actual sales price.

30. To put it differently, the fake discount information presented by Defendant's falsely advertised reference and sale prices first causes consumers to (reasonably) perceive they are receiving a bargain when the merchandise is purchased at its "sale" price. This consumer perception results in these consumers gaining an additional "transaction value"[27] on their outlet purchases, which they would not have otherwise gained but for Defendant's fake discounting scheme. Consumers' valuation of Under Armour Factory outlet merchandise therefore increases in the aggregate.

31. Fundamental economics concepts and principles dictate that the harm caused by Defendant's scheme is uniformly suffered by deceived and, to the extent there are any, non-deceived Factory outlet shoppers alike. One such principle is that cost and demand conditions determine the market prices paid by all consumers.[28] The aggregate demand curve for a product, including Defendant's, represents consumers' valuation of that product as a whole; as consumers' valuation increases, the demand curve shifts outward. When the aggregate demand curve of a product shifts outward, its market price will increase. Therefore, a specific individual's willingness to pay a certain price for a product will not negate how market prices, as

---

[27] Thaler, *Mental Accounting and Consumer Choice*, *supra* n.6, at 205 ("To incorporate … the psychology of buying into the model, two kinds of utility are postulated: acquisition utility and transaction utility. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal.'"); Grewal & Compeau, *Comparative Price Advertising*, *supra* n.1, at 55 ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."); Grewal & Compeau, *Pricing and public policy*, *supra* n.14, at 7.

[28] Mankiw, N. *Essentials of Economics*, 8th Edition. Boston, MA: Cengage Learning, 66 (2015) ("[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace"); *see also* Hal R. Varian, *Microeconomics Analysis*. 3rd Edition. New York, NY: W. W. Norton & Company, at 23-38, 144-57, 233-353 & 285-312 (1992).

determined by aggregate demand, dictate what all consumers purchasing a given product will pay.

32.     As a result, Defendant's pricing scheme impacts the market prices of its Under Armour Factory outlet products, and any one individual consumer's subjective beliefs or idiosyncratic rationales will not isolate them from the resultant artificial and illegitimate inflation in Under Armour Factory outlet prices. Economic theory ensures that as the aggregate demand curve for the products moves outward, all consumers are forced to pay a higher price than the products would command absent the fake discounting scheme. Plaintiffs and proposed Class (defined below) members thus suffered a common impact from Defendant's misconduct.

### D.   Investigation

33.   Plaintiffs' counsel has conducted a large-scale, comprehensive investigation into Defendant's fake discounting scheme at its Under Armour Factory outlet stores and online at underarmour.com/en-us/c/outlet/. Plaintiffs' counsel has tracked items in Defendant's Under Armour Factory stores across California from February 7, 2022, and continuing—often on a daily or near-daily basis—until September 23, 2022. Plaintiffs' counsel made additional visits in May 2024 to confirm that Defendant's Under Armour Factory items remained falsely discounted under the same pricing scheme, and confirmed that they did. Plaintiffs' counsel also began an investigation in Oregon in September 2023, which is currently ongoing. Plaintiffs' counsel has also monitored Defendant's pricing in New York. Notably, at all times (2022, 2023, and 2024), all products observed remained "discounted" under the same, uniform pricing scheme[29] at all locations regardless of the state and year. Attached as **Exhibit D** to this complaint is a list of exemplary products tracked in California. The only thing that changed was the advertised discount and/or reference price on certain merchandise. In other words, all items had price tags that were

---

[29] That is, the fake discounting scheme described above in Section III.B. has appeared uniformly implemented at each location. *See* **Exhibit A.**

constantly "discounted" by in-store signage indicating a substantial percent off ("__% Off") or whole-price reduction discount.

34.     Thus, the investigation confirms that the "original" or "price tag" reference price of the items Plaintiffs purchased were never the actual selling prices of those items because they were never offered at those prices, but rather, consistently with Defendant's uniform scheme, continuously offered for sale at fake discount prices. The investigation confirmed that this was a pervasive, uniform, and systematic practice at Defendant's Under Armour Factory stores, as thousands of items remained continuously discounted throughout the investigation period, including those products purchased by Plaintiffs.[30] Indeed, the investigation

[30] Numerous false discount pricing cases brought in California federal district courts have held that, notwithstanding [FRCP] Rule 9(b) (not applicable here), that plaintiffs are **not** required to perform or provide **any** specific details pertaining of pre-lawsuit investigations into false discounting practices in order to defeat a motion to dismiss. *See, e.g., Rubenstein*, 687 F.App'x at 568 ("Without an opportunity to conduct any discovery, Rubenstein cannot reasonably be expected to have detailed personal knowledge of Neiman Marcus's internal pricing policies or procedures for its Last Call stores. Because Rubenstein need not specifically plead facts to which she cannot 'reasonably be expected to have access,' her allegations regarding the fictitious nature of the Compared To prices may properly be based on personal information and belief at this stage of the litigation."); *Stathakos*, 2016 WL 1730001, at *3–4 (complaint lacking in any allegations related to pre-suit investigation of false discounting practice satisfied Rule 9(b); *Knapp*, 2016 WL 3268995, at *4 (allegations of "perpetual sale" were alone sufficient); *Horosny*, 2015 WL 12532178, at *4 (denying motion to dismiss where plaintiff pled existence of deceptive pricing scheme "on information and belief" only, without investigation); *see also Le v. Kohls Dept. Stores, Inc.*, 160 F.Supp.3d 1096, 1099 (E.D. Wis. Feb. 8, 2016) (denying a motion to dismiss where the plaintiff had not conducted a nationwide pre-suit investigation before alleging the defendant's comparison prices did not reflect a price at which its merchandise was routinely sold). Still, complaints containing pre-suit investigation allegations similar to Plaintiffs' here have routinely been sustained over motion to dismiss challenges, in California federal courts as well as state courts which notably *do not* apply Federal Rule 9(b)'s heightened pleading standard for actions sounding in fraud. *See, e.g., Adams v. Cole Haan, LLC*, No. 8:20-CV-00913-JWH-DFMx, 2021 WL 4907248 (C.D. Cal. Mar. 1, 2021); *Dahlin v. Under Armour, Inc.*, No. CV 20-3706 PA (JEMx), 2020 WL 6647733 (C.D. Cal. July 31, 2020); *Inga*, 2020 WL 5769080, at *1; *Harris v. PFI W. Stores, Inc.*, No. SACV 19-2521 JVS (ADSx), 2020 WL 3965022, at *1 (C.D. Cal. Apr. 9, 2020); *Calderon v. Kate Spade & Co., LLC*, No. 3:19-CV-00674-AJB-JLB, 2020 WL 1062930 (S.D. Cal. Mar. 5, 2020); *Fisher v. Eddie Bauer LLC*, No. 19-cv-857 JM (WVG) 2020 WL 4218228 (S.D. Cal. Feb. 3, 2020); *Dennis v. Ralph Lauren Corp.*, No. 16-cv-1056-WQH-BGS, 2017 WL 3732103 (S.D. Cal. Aug. 29, 2017); *Rael v. New York & Co., Inc.*, No. 16-CV-369-BAS (JMA), 2017 WL 3021019 (S.D. Cal. July 17, 2017); *Azimpour v. Sears, et al.*, No. 15-CV-2798 JLS (WVG), 2017

indicated that Under Armour Factory merchandise is never offered for sale at its full "original" price—and certainly are not "on a regular basis for a reasonably substantial period of time," as required by the FCTA. *See* 16 C.F.R. § 233.1 ("[T]he former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time"); 16 C.F.R. § 233.3 ("To the extent that list or suggested retail prices do not in fact correspond to prices at which a substantial number of sales of the article in question are made, the advertisement of a reduction may mislead the consumer.")

35.     Plaintiffs' counsel has also monitored Under Armour Factory outlet merchandise sold online at underarmour.com/en-us/c/outlet/ during 2024. Underarmour.com/en-us/c/outlet/ sells the same Under Armour Factory merchandise as the brick-and-mortar Factory outlet stores in California. Plaintiffs' counsel found that the merchandise for sale on underarmour.com/en-us/c/outlet/ was subject to the same perpetual false discounting scheme. Indeed, everything offered on underarmour.com/en-us/c/outlet/ appears to be always, if not virtually always, advertised at discounts from higher reference prices. This confirmed allegations in Section III.B. above—that items for sale on underarmour.com/en-us/c/outlet/ are perpetually and uniformly priced with substantially "discounted" sale prices appearing next to both the "crossed out" (or "strikethrough") "original" price, next to the lower "sale" price. Attached hereto as **Exhibit F** is a summary of product tracking data collected by Plaintiffs' counsel during 2024.

36.     Plaintiffs' counsel also researched underarmour.com/en-us/c/outlet/ with the Wayback Machine. The website snapshots recorded by the Wayback Machine are consistent with the investigation. *See* **Exhibit D**. The website snapshots recorded by

WL 1496255 (S.D. Cal. Apr. 26, 2017); *Fallenstein v. PVH Corp., et al.*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint); *Schertzer v. Alpargatas USA Inc* (Super. Ct. San Diego, 37-2019- 00015352, Dkt. No 45).

the Wayback Machine showed discounted prices on Underarmour.com/en-us/c/outlet/ merchandise across several months before Plaintiffs' purchases.

37.    Thus, the false discounting scheme used by Defendant on its Under Armour Factory merchandise is uniformly and identically applied on all, or virtually all, of the Under Armour Factory products sold through Defendant's California brick-and-mortar outlet stores and e-commerce website, underarmour.com/en-us/c/outlet/.

38.    Despite Plaintiffs' counsel's best efforts at investigation, the full extent of Defendant's false and deceptive pricing scheme can only be revealed through a full examination of records exclusively in Defendant's possession.

## VII.   PARTIES

**Plaintiff Mark Williams**

39.    Plaintiff Mark Williams resides in La Quinta, California. On May 11, 2024, Plaintiff Williams went shopping for some new clothing at the Under Armour Factory outlet store located at 1 Mills Cir Suite 328A, Ontario, CA 91764 ("Ontario Mills Outlets"). In reliance on Defendant's false and deceptive advertising, marketing and discount pricing scheme, Plaintiff Williams purchased the following item from the Ontario Mills Outlets on May 11, 2024:

| No. | Item: | "Original" Price: | Purported Discount | Purchase Price: |
|---|---|---|---|---|
| 1 | Men's UA Playoff 2.0 Blocked Polo shirt | $70.00 | 30% Off | $49.00 |

40.    During his time at the Under Armour Factory outlet store on May 11, 2024, Plaintiff Williams browsed several items before deciding on what to purchase. After reviewing the advertised sale price for the golf shirt listed above, Plaintiff Williams decided to purchase it. During his time there on May 11, 2024, Plaintiff Williams also noticed numerous signs advertising various "__% Off" discounts on items throughout the store.

41.    Indeed, after observing the original prices of the item and the accompanying sale price, Plaintiff Williams believed he was receiving a significant

discount on the items he had chosen. He relied on the purported discount and his belief that the discounted price on the item was limited and would not last was material and integral to his purchase decision. He would not have made the purchase were it not for the significant bargain he thought he was receiving.  On all products, the advertised discounts were a material representation to him, and he relied on them in making his purchase decision. Plaintiff Williams paid an after-tax total of $53.29. However, he did not receive the benefit of his bargain and, in reality, paid more for the item than it was worth.

42.     Plaintiff Williams has therefore suffered economic injury as a direct result of Defendant's unlawful, unfair, and fraudulent false reference pricing scheme.

**Plaintiff Pamela Cho**

43.     Plaintiff Pamela Cho resides in Mountain View, California. On May 25, 2024, Plaintiff Cho went shopping for some new clothing at the Under Armour Factory outlet store located at 464 Great Mall Dr., Milpitas, CA 95035 ("Milpitas Outlet") In reliance on Defendant's false and deceptive advertising, marketing and discount pricing scheme, Plaintiff Cho purchased the following items from the Milpitas Outlets on May 25, 2024:

| No. | Item: | "Original" Price | Purported Discount | Purchase Price |
|-----|-------|------------------|--------------------|----------------|
| 1 | UA Elite Cargo Print P (SKU 196885373879) | $110.00 | 50% Off | $55.00 |
| 2 | Movement Full Zip Jacket (SKU 196885338229) | $59.97 | 50% Off | $29.98 |
| 3 | Mileage 3.0 Short-BLK (SKU 195253048821) | $25.00 | 50% Off | $12.50 |
| 4 | UA Golf Vented Short-B (SKU 196040210759) | $70.00 | 50% Off | $35.00 |
| 5 | UA Sportstyle Elite CR (SKU 195253897252) | $100.00 | 50% Off | $50.00 |
| 6 | UA Elevated Woven 2.0 (SKU 194513790241) | $45.00 | 50% Off | $22.50 |

44.     During her time at the Under Armour Factory outlet store on May 25, 2024, Plaintiff Cho browsed several items before deciding on what item to purchase. After reviewing the advertised sale price for the items listed above, Plaintiff Cho decided to purchase the above listed items. During her time there on May 25, 2024, Plaintiff Cho also noticed numerous signs advertising various "__% Off" discounts on items throughout the store.

45.     Indeed, after observing the original prices of the items and the accompanying sale prices, Plaintiff Cho believed she was receiving a significant discount on the items she had chosen. Her belief that the discounted prices on the items was limited and would not last was material and integral to her purchase decision. She would not have made the purchase were it not for the significant bargain she thought she was receiving.  On all products, the advertised discounts were a material representation to her, and she relied on them in making her purchase decision.  As shown by her receipt, attached hereto as **Exhibit B**, the total "original" price for all six item(s) was $409.97, the purported discount was $204.99, and sales tax was $19.22.  Plaintiff Cho paid an after-tax total of $224.20. However, Plaintiff Cho did not receive the benefit of her bargain and, in reality, paid more for the items than they were worth.

46.     Plaintiff Cho has therefore suffered economic injury as a direct result of Defendant's unlawful, unfair, and fraudulent false reference pricing scheme.

**Plaintiffs' Economic Injuries Are Readily Quantifiable**

47.     Indeed, Plaintiffs' economic injury resulting from Defendant's misconduct is reliably quantifiable. Plaintiffs overpaid for each item purchased as described herein. And it was Defendant's false reference pricing scheme and attendant deception that caused Plaintiffs to overpay. Despite Plaintiffs' original beliefs that each item was discounted and thus that its value was significantly greater than the sale price paid for it, Plaintiffs, in actuality, paid an *inflated* price for each item.

48.    That is, the items Plaintiffs purchased were each worth less than the amount Plaintiffs paid for them and if Defendant had not employed the falsely advertised "original" prices for the items, then they would not have commanded such a high, inflated price. The price premium Plaintiffs paid—i.e., the difference between the amount Plaintiffs paid and the value received, or the but-for price the product would have commanded absent the false discounting scheme, can be isolated through multiple expert-based models, including hedonic regression, conjoint analysis, and market simulation, which Plaintiffs will further describe in their motion to certify this action as a class action pursuant to Fed. R. Civ. P. 23.

## **Plaintiffs Have Standing for Injunctive Relief and Lack an Adequate Remedy at Law**

49.    Plaintiffs are also susceptible to harm reoccurring, and therefore require an injunction, because they cannot be certain that Defendant will have corrected this deceptive pricing scheme, and they desire to shop at Defendant's Under Armour Factory stores in the future because they like the brand and the clothing styles offered. Due to the enormous, fluctuating variety of styles and sizes of merchandise offered at Under Armour Factory stores, Plaintiffs will be unable to parse what prices are inflated and untrue, and what prices are not. Plaintiffs simply do not have the resources to ensure that Defendant is complying with California and federal law with respect to its pricing, labeling, and advertising of its outlet merchandise.

50.    Further, because of the wide selection of merchandise available at Defendant's Under Armour Factory outlet stores, the sheer volume of Under Armour Factory products involved in Defendant's deceit (i.e., virtually all of them), and the likelihood that Defendant may yet develop and market additional Under Armour Factory merchandise items for sale, Plaintiffs may again, by mistake, purchase a falsely discounted product at one of the Under Armour Factory stores under the reasonable, but false, impression that Defendant had corrected the scheme and that its reference price advertisement represented a *bona fide* former price at which the

item was previously offered for sale by Defendant. However, without a substantial, time-consuming, and costly investigation, Plaintiffs will have no way of knowing whether Defendant has deceived them again.

51.    Absent an equitable injunction enjoining Defendant from continuing in the unlawful course of conduct alleged herein, Plaintiffs, members of the Class, and the public will be irreparably harmed and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Defendant's ongoing and deceptive conduct that cannot be remedied with monetary damages. Accordingly, Plaintiffs, members of the Class, and the general public lack an adequate remedy at law and an injunction is the only form of relief which will guarantee Plaintiffs and other California consumers the appropriate assurances

52.    Moreover, Plaintiffs lack an adequate remedy at law with respect to their claims seeking equitable restitution because they have not yet retained an expert to determine whether an award of damages can or will adequately remedy their monetary losses caused by Defendant. Moreover, to the extent Plaintiffs have suffered damages as measured by the difference between the price paid and the value represented, California law prohibits them from recovering that measure of damages, but it does not prohibit them from recovering that measure as equitable relief. Cal. Civ. Code § 3343. Particularly, as legal damages focus on remedying the loss to the Plaintiffs, and equitable restitution focuses wholly distinctly on restoring monies wrongly acquired by the defendant, legal damages are inadequate to remedy Plaintiffs' losses because Plaintiffs do not know at this juncture, and are certainly not required to set forth evidence, whether a model for legal damages (as opposed to equitable restitution) will be viable or will adequately compensate Plaintiffs' losses.[31]

_____

[31] Similar allegations have been upheld in other false discount cases where the defendant has likewise challenged the plaintiffs' ability to seek equitable relief following the decision in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). *See, e.g., Dahlin*, 2020 WL 6647733, at *4-5; *Adams*, 2021 WL 4907248, at *3-4 (C.D. Cal. Mar. 1, 2021); *Fallenstein*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss

**Defendants**

53.    Plaintiffs are informed and believe, and upon such information and belief allege, Defendant Under Armour, Inc. is a Maryland corporation with its principal executive offices in Baltimore, Maryland. Plaintiffs are informed and believe that Defendant Under Armour owns and operates Under Armour Factory outlet stores in California and advertises, markets, distributes, and/or sells clothing and accessories in California and throughout the United States.

54.    Plaintiffs do not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sue such defendants by such fictitious names. Plaintiffs are informed and believe, and upon such information and belief allege, that each of the Doe defendants is, in some manner, legally responsible for the damages suffered by Plaintiffs and members of the proposed Class as alleged herein. Plaintiffs will amend this Complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

55.    Defendant knows that its reference price advertising is false, deceptive, misleading, unconscionable, and unlawful under California and federal law.

56.    Defendant fraudulently concealed from and intentionally failed to disclose to Plaintiffs and other members of the proposed Class the truth about its advertised discount prices and former reference prices. Defendant concealed from consumers the true nature and quality of the products sold at its Under Armour Factory outlet stores.

57.    Defendant intentionally concealed and failed to disclose material facts regarding the truth about false former price advertising in order to provoke Plaintiffs and the proposed Class to purchase Under Armour Factory outlet products in its stores.

---

Plaintiff's First Amended Complaint). *Dahlin v. The Donna Karan Co. Store, LLC*, No. 2:21-cv-07711-AB-JPRx (C.D. Cal. Mar. 16, 2022) at ECF No. 30 (Order Denying Motion to Dismiss Plaintiff's First Amended Complaint) at 5-10

58.    At all relevant times, Defendant has been under a duty to Plaintiffs and the Class to disclose the truth about its false discounts.

## VIII.  CLASS ALLEGATIONS

59.    Plaintiffs bring this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Class against Defendant:

> All persons who, within the State of California and within the applicable statute of limitations preceding the filing of this action (the "Class Period"), purchased from a Under Armour Factory store (in-person or online) one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

Excluded from the Class is Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiffs reserve the right to expand, limit, modify, or amend this Class definition, including the addition of one or more classes, in connection with their motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

60.    ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe that the proposed Class contain hundreds of thousands of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiffs.

61.    ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.      whether, during the Class Period, Defendant used falsely advertised reference prices on their Under Armour Factory outlet product labels and falsely advertised price discounts on merchandise sold in its outlet stores;

b.      whether Defendant ever offered items for sale or sold items at their advertised reference price;

c.      whether, during the Class Period, the original price advertised by Defendant was the prevailing market price for the products in question during the three months preceding the dissemination and/or publication of the advertised former prices;

d.      whether Defendant's purported sale prices advertised in its Under Armour Factory outlet stores reflected any actual discounts or savings;

e.      whether Defendant's purported percentage-off discounts advertised in its Under Armour Factory outlet stores reflected any actual discounts or savings;

f.      whether Defendant's alleged conduct constitutes violations of the laws asserted;

g.      whether Defendant's alleged conduct constitutes violations of federal and/or California pricing regulations;

h.      whether Defendant engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

i.      whether Plaintiffs and Class members are entitled to damages and the proper measure of that loss; and

j.      whether an injunction is necessary to prevent Defendant from continuing to use false, misleading or illegal price comparisons.

62.    ***Typicality***: Plaintiffs' claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely

to be deceived) by Defendant's false and deceptive price advertising scheme, as alleged herein. Plaintiffs are advancing the same claims and legal theories on behalf of herself and all Class members.

63.   *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no antagonistic or adverse interests to those of the Classes.

64.   *Superiority*: The nature of this action and the nature of laws available to Plaintiffs and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to them and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Plaintiffs and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendants will be permitted to retain the proceeds of its fraudulent and deceptive misdeeds.

65.   All Class members, including Plaintiffs, were exposed to one or more of Defendant's misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendant's consistent false sale prices, advertising scheme, disseminated in a years-long campaign to California consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Class. In addition, it can be reasonably presumed that all Class members, including Plaintiffs, affirmatively acted in response to the representations

contained in Defendant's false advertising scheme when purchasing merchandise sold at Under Armour Factory outlet stores.

66.    Plaintiffs are informed that Defendant keeps extensive computerized records of its Under Armour Factory outlet customers through, *inter alia*, customer loyalty programs, credit card programs, and general marketing programs. Defendant has one or more databases through which a significant majority of Class members may be identified and ascertained, and they maintain contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## IX.   CAUSES OF ACTION
## FIRST CAUSE OF ACTION
### Violation of California's Unfair Competition Law ("UCL")
### CAL. BUS. & PROF. CODE §§ 17200, *et seq.*

67.    Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

68.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

69.    The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  Cal. Bus. Prof. Code § 17200.

70.    The UCL imposes strict liability. Plaintiffs and members of the proposed Class need not prove that Defendant intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

### *"Unfair" Prong*

71.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or

substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

72.     Defendant's actions constitute "unfair" business practices because, as alleged above, Defendant engaged in misleading and deceptive price comparison advertising that represented false reference prices and corresponding deeply discounted phantom "sale" prices. Defendant's acts and practices offended an established public policy of transparency in pricing, including regulations enacted by the FTC, and they constituted immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

73.     The harm emanating from this practice to Plaintiffs and members of the proposed Class outweighs any utility it provides because Defendant's practice of advertising false discounts provides no utility. There were reasonably available alternatives to further Defendant's legitimate business interests other than the misleading and deceptive conduct described herein.

***"Fraudulent" Prong***

74.     A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

75.     Defendant's acts and practices alleged above constitute fraudulent business acts or practices as Defendant has deceived Plaintiffs and members of the proposed Class and is highly likely to deceive members of the consuming public. Plaintiffs and members of the proposed Class relied on Defendant's fraudulent and deceptive representations regarding its false or outdated "original prices" for products sold by Defendant at its Under Armour Factory outlet stores. These misrepresentations played a substantial role in Plaintiffs' and members of the proposed Class's decision to purchase the product at a purportedly steep discount, and Plaintiffs and members of the proposed Class would not have purchased the product without Defendant's misrepresentations.

*"Unlawful" Prong*

76.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

77.   Defendant's acts and practices alleged above constitute unlawful business acts or practices as Defendant has violated state and federal law in connection with its deceptive pricing scheme. The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements. 15 U.S.C. § 52(a). Under the FTC, false former pricing schemes, like Defendant's, are described as deceptive practices that would violate the FTCA:

> (a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - *for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the "bargain" being advertised is a false one*; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price
>
> (b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

78.     In addition, Defendant's acts and practices violate California law, which expressly prohibits false former pricing schemes. The FAL, Cal. Bus. & Prof. Code § 17501, entitled "*Worth or value; statements as to former price*," states:

> For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published. ***No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement*** or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

Cal. Bus. & Prof. Code § 17501 (emphasis added).

79.     Defendant violates § 17501 because it advertises items, including the items that Plaintiffs purchased and are described herein, with a former "original" or "Ticketed Price" that greatly exceeds the prevailing market price of those items. Defendant's own sales records will show that it normally sells its products, including the items purchased by Plaintiffs, at prices lower than the advertised former "original" or "Ticketed Price," thereby establishing that those prices exceed the prevailing market price of Defendant's merchandise in violation of Cal. Bus. & Prof. Code § 17501.

80.     As detailed in the Third Cause of Action below, the CLRA, Cal. Civ. Code § 1770(a)(9), prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

81.     As detailed herein, and for the same reason that Defendant's acts and practices violate the FTCA and the FAL, they also violate the CLRA.

82.     Defendant's practices, as set forth above, misled Plaintiffs, the proposed Class, and the public in the past and will continue to mislead them in the

future. Consequently, Defendant's practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

83.    Defendant's violations of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat to Plaintiffs, members of the proposed Class, and the public who, if Defendant's false pricing scheme is permitted to continue, will be deceived into purchasing products based on illegal price comparisons. These false comparisons created phantom markdowns and lead to financial harm for consumers like Plaintiffs and the members of the proposed Class as described herein. Because of the surreptitious nature of Defendant's deception, these injuries cannot be reasonably avoided and will continue to be suffered by the consuming public absent a mandated change in Defendant's practice.

84.    Pursuant to Bus. & Prof. Code § 17203, Plaintiffs and members of the proposed Class are entitled to preliminary and permanent injunctive relief enjoining Defendant from continuing to engage in this unfair competition alleged above, as well as disgorgement and restitution to Plaintiffs and the proposed Class of all Defendant's revenues wrongfully obtained from them as a result of Defendant's unfair competition, or such portion of those revenues as the Court may find equitable.[32]

---

[32] California permits broad discretion to fashion remedies as needed, and "the appropriate measure of recovery [under the equitable provisions of California's consumer protection laws] depends on the nature of the case and the alleged harm that [a plaintiff] suffers." *Le*, 160 F. Supp. 3d at 1104. "California's consumer protection laws…authorize multiple forms of restitutionary recovery." *Id.* at 1105; *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) ("[I]n calculating restitution under the UCL and FAL, the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information."); *Jacobo*, 2016 WL 3482041, at *7 ("Remedy for the alleged misconduct is not limited to the difference between the value of the goods [p]laintiffs purchased and the price for those goods."); *Russell v. Kohl's Dep't Stores, Inc.*, No. ED CV 15-1143 RGK (SPx), 2015 WL 12781206, at *3-4 (C.D. Cal. Oct. 6, 2015) (explaining why cost minus value is not the exclusive method of measuring restitution); *Spann v. J.C. Penney Corp.*, No. SA CV 12-0215 FMO (RNBx), 2015 WL 1526559, at *4 (C.D. Cal. Mar. 23, 2015) ("[A]lthough California case law makes clear that [cost minus value]

## **SECOND CAUSE OF ACTION**

### **Violation of California's False Advertising Law ("FAL")**

### **CAL. BUS. & PROF. CODE §§ 17500,** *et seq.*

85.     Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

86.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant for violations of California's FAL, Cal. Bus. & Prof. Code §§ 17500, *et seq*.

87.     Cal. Bus. & Prof. Code § 17500 provides:

> It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of . . . personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that . . . personal property or those services . . . which is ***untrue or misleading***, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . .

(emphasis added).

88.     The "intent" required by section 17500 is the intent to make or disseminate personal property (or cause such personal property to be made or disseminated), and not the intent to mislead the public in the making or dissemination of such property.

---

can be a measure of restitution, defendant has not cited, nor has the court found, any authority indicating that is the only way restitution can be calculated."); *Johns v. Bayer Corp.*, No. 09-cv-1935-AJB (DHB), 2012 WL 1520030, at *5 (S.D. Cal. Apr. 30, 2012) (finding that neither In re Vioxx nor any other case cited by the defendant "suggest[ed] that the difference in price paid and value received is the only proper measure of restitution"); *Stathakos*, 2016 WL 1730001, at *4 (challenge to restitution methodology premature at motion to dismiss stage); *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 792 (2015) (explaining that *In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009) did not limit measuring restitution to the price/value differential).

89.     Similarly, this section provides:

no price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price … within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement.

Cal Bus. & Prof. Code § 17501.

90.     Defendant's routine of advertising discounted prices from false "reference" prices, which were never the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendant's average and/or most common actual sale price), constitutes an unfair, untrue, and misleading practice in violation of the FAL. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold at Defendant's Under Armour Factory outlet stores were worth more than they actually were.

91.     As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendant's business, Plaintiffs and members of the proposed Class suffered economic injury.

92.     Plaintiffs and members of the proposed Class request that this Court order Defendant to restore this money to Plaintiffs and the proposed Class, and to enjoin Defendant from continuing these unfair practices in violation of the FAL in the future. Otherwise, Plaintiffs, members of the proposed Class, and the broader general public will be irreparably harmed and/or denied an effective and complete remedy.

## THIRD CAUSE OF ACTION

**Violation of California's Consumers Legal Remedies Act ("CLRA")**

**CAL. CIV. CODE § 1750, *et seq.***

93.     Plaintiffs repeat and re-allege the allegations contained in every preceding paragraph as if fully set forth herein.

94.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the CLRA, Cal. Civ. Code § 1750, *et seq.*

95.     Plaintiffs and each member of the proposed Class are "consumers" as defined by Cal. Civ. Code § 1761(d). Defendant's sale of products at their Under Armour Factory outlet stores were "transactions" within the meaning of Cal. Civ. Code § 1761(e). The products purchased by Plaintiffs and members of the proposed Class are "goods" or "services" within the meaning of Cal. Civ. Code § 1761(a)-(b).

96.     Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiffs and members of the proposed Class which were intended to result in, and did result in, the sale of products sold at their Under Armour Factory outlet stores and underarmour.com/en-us/c/outlet/:

      a.    advertising goods or services with intent not to sell them as advertised; § 1770(a)(9); and

      b.    making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions; § 1770(a)(13).

97.     Plaintiffs are consumers who have suffered economic injury and damages, including benefit of the bargain damages, as a result of Defendant's use and employment of the false and misleading reference pricing alleged herein. Pursuant to Cal. Civ. Code § 1780(a), Plaintiffs therefore seek an order enjoining such methods, acts, or practices as well as any other relief the Court deems proper.

Plaintiffs additionally seek costs and reasonable attorney's fees pursuant to Cal. Civ. Code § 1780(e).

98.   On July 26, 2024, Plaintiffs, through counsel, sent a CLRA demand letter by certified mail to Defendant that provided notice of Defendant's violation of the CLRA and demanded Defendant correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein. The letter also stated that if Defendant refused to do so, Plaintiffs would file a complaint seeking damages in accordance with the CLRA. If Defendant does not respond to Plaintiffs' letter or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782, Plaintiffs will amend the complaint to seek actual, punitive, and statutory damages, as appropriate against Defendant.

99.   Filed concurrently is a declaration of venue pursuant to Cal. Civ. Code §1780(d).

## X.   PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and on behalf of the other members of the Class, request that this Court award relief against Defendant as follows:

a.   an order certifying the Classes and designating Plaintiffs as the Class Representatives and their counsel as Class Counsel;

b.   awarding restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs and the Class members as a result of its unlawful, unfair, and fraudulent business practices described herein;

c.   awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court

supervision, victims of its misconduct and pay them all money they are required to pay;

d.      ordering payment of damages as permitted by law, including actual, compensatory, benefit of the bargain, and statutory damages, to the full extent permitted by law;

e.      retaining jurisdiction to monitor Defendant's compliance with permanent injunctive relief;

f.      ordering Defendant to engage in a corrective advertising campaign;

g.      awarding attorneys' fees and costs; and

h.      for such other and further relief as the Court may deem necessary or appropriate.

## XI.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: July 26, 2024                    **LYNCH CARPENTER LLP**

By:  _/s/ Todd D. Carpenter_
Todd D. Carpenter (CA 234464)
todd@lcllp.com
Scott G. Braden (CA 305051)
scott@lcllp.com
James B. Drimmer (CA 196890)
jim@lcllp.com
1234 Camino Del Mar
Del Mar, California 92014
Telephone:  619.762.1910
Facsimile:   858.313.1850

*Attorneys for Plaintiffs and Proposed Class Counsel*

CLASS ACTION COMPLAINT